UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| LAURA PEAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:10-cv-465 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Laura Pear appeals the Social Security Administration's ("SSA") decision to deny her application for disability insurance benefits. An administrative law judge found that Pear was not disabled within the meaning of the Social Security Act because she could perform a significant number of jobs in the national economy. While the majority of the ALJ's conclusions were supported by substantial evidence in the record, questions remain about the extent of Pear's residual functional capacity and whether in fact there are significant jobs in the national economy that she could perform. The case will therefore be remanded on that narrow issue.

## BACKGROUND

Plaintiff Laura Ann Pear filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in October of 2006, alleging that she became disabled on October 1, 2003 as a result of her Crohn's disease. [R. 151-59, 211.] Her applications were denied initially and upon reconsideration. [R. 91-113.] At a subsequent hearing before an ALJ, three witnesses testified: Pear, a medical expert, and a vocational expert. [R. 31-84.] The ALJ issued a decision in which she found that Plaintiff was not disabled under the Social Security Act

because she was able to perform jobs that existed in significant numbers in the national economy. [R. 6-30.] Pear appealed that decision, but the Appeals Council denied her request for review of the ALJ's decision. [R. 1-4.] At that point the ALJ's decision became the final decision of the Commissioner, and Pear therefore filed this civil action, pursuant to 42 U.S.C. § 405(g), for review of the Agency's decision.

Pear was 40 on the date she was last insured and 41 when the ALJ issued her decision. [R. 11, 26, 151.] Pear did not graduate from high school; she does have a GED but no other higher education. Prior to the onset of her Crohn's disease she had worked as a warehouse worker and as a secretary, with her last job being in 2003. [R. 41-42, 73.] She stopped working at that job because of symptoms from her Crohn's disease such as cramping, bloating, vomiting, regular diarrhea, and pain. [*Id.*] She had not looked for work since that time, and her condition had worsened. [*Id.*] Sometimes she could not get out of bed due to fatigue, depression, and other symptoms. [*Id.*] She stated that she had diarrhea ten to twenty times a day, every day. [*Id.*] She testified to taking Prednisone steroids for her Crohn's disease at the McCauley Clinic where she could get the drug cheaply; she had not tried Remicade, which her doctor recommended, because she could not afford it. [R. 43.]

Pear testified that she tried not to drink alcohol because it did not interact well with her medication, but she did so occasionally. [R. 44.] She had used illegal drugs in the past, but testified that she had not used any in the last three years and had just stopped using on her own (without any formal drug treatment). [*Id.*] She is a smoker and testified to smoking "less than a pack a day." [*Id.*] She had previously applied for Medicaid, but was denied, and her only income was food stamps. [R. 41.]

2

Pear testified that her stomach became distended or "blew up" a few times a week, and this was very painful. [R. 47.] She testified that she went to the bathroom between ten and thirty times a day. [R. 52.] She had some diarrhea every day, but the bloating did not happen daily. [*Id.*] She stated she was fatigued about every other day. [R. 54.] She also testified that she regularly threw-up, though her testimony about the frequency is fuzzy: at one point she testified that she threw-up two to three times a week [R. 49], while at another point she testified that she threw-up three or four times a day about three or four times a week. [R. 53.]

Dr. Sheldon Slodki testified as a medical expert at the hearing and concluded that Pear did not meet or equal the listings for Crohn's disease, anemia, or any other condition.[1] [R. 57-60.] Slodki testified that the amount of Prednisone Pear was currently receiving was a low dose and not medically consistent with her testimony regarding her symptoms or the recent clinic records in terms of complaints. [R. 60.] Slodki also pointed out that when Pear went to the emergency room on May 23, 2008, she had a drug screen and was positive for "cocaine, PHC [*sic*[2]], and menzobiazapam," tests results that were inconsistent with her earlier testimony about when she had discontinued her use of illicit drugs. [R. 57.] Slodki testified that there could be limitations from Crohn's disease due to fatigue and weakness depending on the degree of control of the condition. [R. 61.] Based on the medical record, Slodki thought that Pear could do light work without any special need for bathroom breaks. [R. 61-62.] He noted that the most recent medical record from March 3, 2009 indicated that she denied any abdominal pain and did not

---

[1]In the hearing transcript, Slodki is incorrectly identified as Dr. Sheldon Lackey.

[2] The reference in Slodki's testimony to "PHC" is an obvious typographical error. It should be "THC" – shorthand for marijuana – as the ALJ noted in her opinion. [R. 20.]

indicate a major problem and that at a prior visit on December 22, 2008 she had denied complaints or problems. [R. 68.]

Julie Bose, a vocational expert ("VE"), also testified at the hearing. As is customary in these hearings, the ALJ asked the VE to consider several hypothetical work limitations that she believed the claimant to possess and determine what jobs would be available for someone with those restrictions. Thus the ALJ asked whether any occupations would exist for an individual who was capable of performing light work with regularly scheduled breaks, in addition to one unscheduled break on a daily basis for five to ten minutes. [R. 74.] The VE stated that a wide range of light unskilled positions could be performed, "particularly in the clerical industry . . . because of the close access to washroom facilities." [R. 75.] The VE stated that general office clerk, order clerk, and collator operator were three positions that would accommodate the need for close bathroom access. [R. 75.] She testified that 3,200-3,400 general office clerk, 1,200-1,400 order clerk, and 800 collator operator positions would exist for a hypothetical individual who needed to take one unscheduled break for five to ten minutes with close bathroom access. She also stated that "if the individual is disrupted in excess of 15 percent of the workday due to an unproductive break, then that would eliminate work." [R. 77.]

The ALJ then changed her original hypothetical involving light work to sedentary work, with an allowance to take a one-to-five-minute bathroom break every hour. [R. 77-78.] The VE testified that with those parameters, an individual could perform the general office clerk position at the sedentary level, and the numbers of jobs would be reduced from 3,200-3,400 to 1,600-1,800. [R. 78.] She also stated that, if some of those bathroom breaks were emergencies (i.e., running to the bathroom), "it would eliminate the telephone clerk position because of the

4

interruption of the phone," would reduce any potential food and beverage order positions by "approximately 50 percent," and the other positions by "approximately 25 percent." [R. 80-81.] The ALJ stated that she did not "like to base a decision based on a guess," and asked the VE how she derived her job numbers:

> So when you're saying you're drawing on your experience, you've gone out and done job placement. You've done some labor market surveys of how these jobs are done and so you've observed people taking breaks with this level frequency and a certain, you say a 25 percent reduction, you know, you say about 25 percent of these would based on your observation allow for more frequent breaks or less frequent breaks?

The VE replied "Yes." [R. 81.]  Ms. Bose stated that there was no data source that provided specific numbers of office clerks, and further that "there is actually absolutely no statistics on numbers of individual jobs based on job titles or how to reduce them based on added scenarios." [R. 81-82.]

In making her disability determination, the ALJ followed the familiar five-step sequential inquiry prescribed by the SSA's regulation: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.  20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 1, 2003; that she had the severe impairments of Crohn's disease and anemia; and that she did not have an impairment or combination of impairments that met or medically equaled any of those included in the Listing of Impairments at 20 C.F.R. pt. 404,

5

subpt. P, app. 1. [R. 11-12.] The ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform sedentary work, except that, in addition to regularly scheduled breaks, she needed close access to a bathroom and might require periodic short bathroom breaks, occurring not more than once an hour. [R. 13.] The ALJ further held that, given this RFC, Plaintiff could not perform any past work but could perform other jobs that existed in significant numbers in the national economy, and that she therefore did not qualify as disabled. [R. 24-26.] *See* 20 C.F.R. § 404.1520(a)(4)(v). The ALJ's decision was affirmed on administrative appeal, and this appeal followed. [R. 4-6.]

### DISCUSSION

My review of an ALJ's decision to deny social security benefits is limited to determining whether the decision is supported by substantial evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Id.* In other words, the SSA's decision, if supported by substantial evidence and reached under the correct legal standard, will be upheld even if reasonable minds could differ as to the appropriate conclusion. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). It is not my job to re-weigh evidence, choose among conflicting versions of events, decide questions of credibility, or substitute my own judgment for the ALJ's. *Young*, 362 F.3d at 1001.

To receive disability benefits under the Social Security Act, a claimant must be "disabled" as defined by the Act. 42 U.S.C. § 423(a)(1)(E). A claimant qualifies as disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A).  Moreover, a claimant's physical or mental impairment or impairments

must be of such severity that he is not only unable to do his previous work but cannot,

considering his age, education and work experience, engage in any other kind of substantial

gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

**I.  The ALJ's Evaluation of Pear's Credibility and Her Residual Functional Capacity**

Pear argues that the ALJ improperly evaluated both her credibility and her Residual

Functional Capacity ("RFC").  Pear argues these as separate points, but they are really

intertwined:  the determination of Pear's RFC depends in large part on the extent to which the

ALJ found Pear's medical records more credible than her testimony.

To determine a claimant's credibility, "an ALJ must consider several factors, including

the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication,

treatment, and limitations."  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  "The finding

must be supported by the evidence and must be specific enough to enable the claimant and a

reviewing body to understand the reasoning."  *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

Since ALJs are in the best position to evaluate credibility, I will defer to the ALJ's credibility

determination and overturn it only if it is patently wrong, unreasonable or unsupported.  *Getch v.

Astrue*, 539 F.3d 473, 478 (7th Cir. 2008).

A claimant's RFC is a measure of her abilities to work despite her impairments.  20

C.F.R. § 404.1545.  The ALJ is required to determine an applicant's RFC in order to evaluate

whether she can perform her past jobs or other jobs in the national economy.  *Id.*  An RFC is not

a medical opinion, but rather an administrative finding based on the ALJ's evaluation of the

record, including all relevant medical and non-medical evidence and the claimant's own statement of what she is able or unable to do. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). When weighing medical opinions, the ALJ must consider, among other things, the examining relationship, treatment relationship, supportability of the opinion, and consistency with the record. 20 C.F.R. § 404.1527.

In this case the ALJ found that while Pear's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," nevertheless her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not fully credible given inconsistencies with the medical evidence and the record overall." [R. 14.]

Pear challenges this conclusion on a number of grounds. First, she argues that the language quoted above is "meaningless boilerplate" that makes it impossible to tell whether the ALJ's decision was supported by substantial evidence. It is a true that several recent Seventh Circuit cases have strongly criticized this boilerplate language in ALJ opinions. *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). But the problem with Pear's argument is that she acts as if the above-quoted statement constituted the entirety of the ALJ's analysis. Far from it. That statement is essentially the ALJ's thesis, and it is followed by *ten pages* of analysis in which she sets forth a detailed history of the medical evidence and analyzes various inconsistencies between the medical record and Pear's testimony.

Indeed, the ALJ's analysis is quite detailed and contradicts Pear's argument that the ALJ is "unclear as to what specific portion of [Pear's] testimony was not credible, or what weight the ALJ gave the testimony." [DE 17 at 17]. In fact, there are at least six instances in the opinion in

which the ALJ specifically highlights testimony that she found incredible or dubious:

- "[T]he claimant was less than truthful regarding her drug and alcohol use at the hearing.  The claimant testified that her last illegal drug use was more than three years prior to the hearing, however medical records confirm drug use in 2008.  This suggests that the claimant was less than forthcoming in her testimony."  [R. 21.]

- "[T]he testimony regarding the frequency of diarrhea cannot be credited, as reports to physicians are inconsistent with the claimant's hearing testimony."  [R. 21.]

- "[T]he claimant has received limited treatment, with no hospitalization due to Crohn's disease since 2006, suggesting that the symptoms were not as severe and debilitating as alleged."  [R. 22.]

- "When I asked if she was referred to a social worker to assist with obtaining the medication, the claimant first testified that she could not remember any such referral, then stated that she was pretty sure she did go but did not get any help.  I did not find this explanation very convincing." [R. 22.]

- "The claimant also testified that she tried many different kinds of medications, but would eventually develop immunity and they stopped working.  There is no corroboration of this in the medical record."  [R. 22.]

- "While this care [of a 65-year-old with cancer] may allow for frequent bathroom breaks and other allowances not permitted on a job site, the claimant's ability to care for herself and an ill, elderly individual suggest that the claimant is not as limited as alleged." [R. 22.]

Ultimately, because of these various inconsistencies between her testimony and the medical record, the ALJ concluded that Pear's testimony was "not fully credible."  [R. 24.]

Given the detail of this analysis, it is simply a mischaracterization to call the ALJ's opinion, as Pear does, a "10 page general summary of the evidence [that] does not shed light on what the ALJ found credible and not credible."  [DE 27 at 5.]  *See also Britton-Dillon v. Astrue*, 433 Fed. Appx. 474, 477 (7th Cir. 2011) ("The ALJ did not fail to discuss [plaintiff's]

9

credibility; rather, he questioned it based on the discrepancy between her alleged inability to work and the medical evidence in the record."); *Outlaw v. Astrue*, 412 Fed. Appx. 894, 899 (7th Cir. 2011) (upholding ALJ's credibility determination where plaintiff "claimed to have severe impairments that prevented him from undertaking most daily activities, but the medical evidence did not support his contentions").

Pear's other critiques of the ALJ's credibility analysis are also unpersuasive.  For instance, Pear argues that the ALJ failed to provide any basis for her conclusion that Pear's statements to doctors she had seen over the years (as recorded in office notes) were more credible than the testimony she gave at the hearing.  But the explanation for this conclusion is obvious:  for the same reason there are hearsay exceptions for present sense impressions, *see* Fed. R. Evid. 803(1), and for statements made for the purpose of medical treatment, *see* Fed. R. Evid. 803(4), statements made by Pear to her doctors at the time she was suffering from her condition could reasonably be assumed to be more credible than her recollections about that suffering made years later at a hearing at which she is trying to obtain disability benefits.

Pear also expresses frustration that the ALJ found her testimony about the frequency of her diarrhea (between 10 and 30 times a day) to be less credible than her medical records.  The ALJ found that the medical records showed that the frequency was less than Pear's testimony indicated, that "only during extreme exacerbations of her Crohn's disease did she experience stools 15 times a day," and that these "severe exacerbations were of limited frequency and duration."  [R. 21.]  Again, this conclusion was supported by the medical evidence.

Pear also argues that the "ALJ erred in concluding that [she] was not compliant with treatment."  [DE 17 at 19.].  The ALJ's conclusion on Pear's compliance derived from the

medical evidence about her use of tobacco, illegal drugs, and alcohol, her repeated failure to take folic acid and the full dose of a drug called Pentasa, her failure to enroll in a University of Chicago research program, and her failure to seek out low cost ways of getting the drug Remicade. Pear argues that it is improper to base the conclusion about her non-compliance on the fact that she failed to enroll in an experimental medical research program or on the fact that her financial conditions prevented her from obtaining Remicade. [See DE 27 at 7-8.] Pear may very well be right on those points – SSR 96-7p requires ALJs to consider whether an individual "may be unable to afford treatment and may not have access to free or low cost medical services." But even if she is, she still has no rebuttal to the other instances of noncompliance, which are sufficient evidence in and of themselves for the ALJ to have concluded that the was not entirely compliant with treatment.

Pear is, moreover, simply incorrect when she argues that there is no evidence in the record that would allow for a conclusion that her use of tobacco, illegal drugs, or alcohol exacerbated her symptoms (and thus contributed to her non-compliance). Pear states: "The ALJ found that, even where the record showed diarrhea up to 15 times per day, the frequency of episodes was caused by non-compliance with treatment, wine and tobacco use. However, this conclusion is not supported by the record; the ALJ failed to cite evidence showing a link between non-compliance, wine, or tobacco use with increased diarrhea episodes." [DE 17 at 20.] Yet there *is* evidence of this link. With respect to tobacco, one of her examining doctor's stated in a report: "Tobacco abuse. I did explain to her and she express understanding that tobacco does make Crohn's typically worse and obviously has other severe medical complications. She is working on cessation." [R. 380.] And with respect to drugs and alcohol, another of the doctors

11

treating Pear when her symptoms flared up instructed her to avoid drugs and alcohol [R. 865],
with the logical inference being that failing to do so would exacerbate her symptoms.

Thus, on all of these issues, the ALJ reasonably found that Pear's "statements regarding
the intensity, persistence, and limiting effects of her physical symptoms were not credible – in
short, that she was exaggerating the severity of her symptoms – because they were inconsistent
with objective medical evidence." *Murphy v. Astrue*, 2012 WL 28846, at *6 (7th Cir. Jan. 6,
2012). Consequently "the record provides adequate support for the ALJ's credibility finding"
such that Pear cannot demonstrate "that the ALJ's credibility finding is patently wrong." *Jens v.
Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

There is one issue, however, that is insufficiently supported by the record and should be
clarified because it may have an effect on Pear's RFC.  Pear complains that the ALJ had no
evidence upon which to base her conclusion that Pear required "one five minute break every
hour and close access to a bathroom" without an explanation as to "why [Pear's] allegations did
not warrant greater limitations."  [DE 27 at 5.]  With respect to the average of one break per
hour, this conclusion makes sense based on the evidence:  the ALJ relied on the medical records,
which indicated somewhere around 15 bathroom breaks a day when the condition was severe,
which would be consistent with an average of roughly one break per hour over the course of an
eight-hour work day.

Pear pushes the issue further, however, by wondering, "How does the ALJ, who is not a
doctor, know that Ms. Pear would not require 10 minutes in the bathroom each time she had a
diarrhea episode?"  [DE 27 at 6.]  This is true, though it is equally true that it might only require
Pear two or three minutes to use the bathroom.  In any event, throughout the questioning of the

12

VE at the hearing, the ALJ used the five minute time frame as part of her hypothetical and Pear's attorney never objected.  In fact, Pear's own counsel even used five minutes as the hypothetical timeframe for his questioning of the VE.  [R. 80.]  At bottom, it seems to me that an ALJ has to have some reasonable leeway to make assumptions based on the evidence, and five-minute average timeframe for bathroom breaks strikes me as a reasonable assumption.

Nevertheless, it is true that there appears to be no testimony from Pear nor any solid evidence in the medical record as to the average timeframe of her bathroom breaks.  And since this case will be remanded for other reasons, as explained in detail below, the ALJ should take the opportunity to collect evidence as to the average timeframe of bathroom breaks for someone with Pear's condition.  This evidence should clarify Pear's RFC and will likely have an impact on the central question that will be at issue on remand – whether there are jobs that exist in significant numbers in the national economy that Pear can perform.

## II.  The Testimony of the Vocational Expert

Pear next argues that the ALJ erred in relying on the testimony of the VE.  A VE will often provide an impartial assessment of the types of occupations in which claimants can work and the availability of positions in such occupations.  *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009).  The decision whether to employ a VE at a hearing is a matter entrusted to the discretion of ALJs, *Ehrhart v. Secretary of H.H.S.*, 969 F.2d 534, 540 (7th Cir. 1992), but once an ALJ decides to rely on a VE's testimony, she must make sure that the testimony comports with the rules set forth in the Commissioner's Social Security Rulings.  For instance, Social Security Ruling 00–4p requires ALJs to ask whether a VE's testimony conflicts with information provided in the Dictionary of Occupational Titles ("DOT") before relying on the VE's

testimony. Social Security Ruling 00–4p at 4; *Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir.

2008).  Ruling 00–4p does not require ALJs to wholly disregard a VE's testimony because part

of it disagrees with the DOT, but Ruling 00–4p does require ALJs to resolve discrepancies

between the two before relying on the conflicting testimony.  *Overman*, 546 F.3d at 464.

Pear first argues that the ALJ failed to comply with Ruling 00-4p.  Pear admits that the

ALJ warned the VE about potential conflicts before the VE testified, but argues that the ALJ still

ran afoul of Ruling 00-4p because she failed to ask about any conflicts *at the end* of the VE's

testimony.  The Seventh Circuit's recent decision in *Weatherbee v. Astrue*, 649 F.3d 565 (7th

Cir. 2011) renders this issue a complete nonstarter.  The court in *Weatherbee* held that there is no

"temporal requirement" for Ruling 00–4p and that there is no "singular method by which ALJs

must elicit potential conflicts."  *Id.* at 570.  The court found that the ALJ in *Weatherbee* had

satisfied Ruling 00–4p:

> A review of the transcript from the administrative hearing establishes that the ALJ
> satisfied the Ruling's requirement.  The ALJ's instruction addressed the issue of
> conflicting testimony before the VE offered her substantive testimony.  The VE
> agreed under oath to identify and resolve any conflict between her testimony and
> the DOT.  Nothing in the hearing's transcript suggests that the VE disregarded
> the ALJ's instructions.  While we do not foreclose the possibility that an ALJ's
> inquiry into the consistency of a VE's testimony with the DOT could be rendered
> inadequate due to its timing in other circumstances, we find that the instructions
> given by the ALJ in this case were sufficient.

*Id.*

The same analysis applies to this case.  Before testifying, the ALJ told the VE:  "This is

very important.  If your testimony differs in any way with what's in the Dictionary of

Occupational Titles, I need you to let me know." [R. 72.]  These instructions are sufficient under

*Weatherbee*.

14

Of course, under *Weatherbee* courts should be sure that "[n]othing in the hearing's transcript suggests that the VE disregarded the ALJ's instructions." *Weatherbee,* 649 F.3d at 570.  Pear argues that there were actually two unresolved conflicts between the DOT and the VE's testimony:

> First, [the VE] provided the same DOT number for two different positions; for both the sedentary office clerk and telephone clerk positions, she stated that the proper DOT code was 237.367-010.  That code is the correct number for the telephone clerk position, but the incorrect number for the general office clerk position.  Second, the only sedentary general office clerk position listed in the DOT 209.562-010 – is a semi-skilled position with an SVP of 3. Since [the VE] testified that the sedentary general office clerk position was unskilled, her testimony was inconsistent with the DOT.

[DE 17 at 12-13 (internal citations omitted).]

These were indeed conflicts, as the Commissioner admits.  But in *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009), the Seventh Circuit held that when a plaintiff does not identify a conflict at the hearing, she has to show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance."  *Terry*, 580 F.3d at 478.  The conflicts Pear cites were not so obvious that the ALJ should have picked up on them.  Moreover, in this case the VE's actual description of the positions were consistent with the DOT, she just misspoke the numeric codes.  Under similar circumstances of a technical mistake – and without any showing that the error resulted in a wrongful conclusion by the ALJ (something Pear has not shown) – courts have affirmed the ALJ's decision.  *See Fischer v. Barnhart*, 181 Fed. Appx. 359, 366 (4th Cir. 2006) (noting that "it is not clear that Social Security Ruling 00-4p even applies to citation errors" because the "[r]uling states that it governs 'conflicts in occupational information,' not erroneous job titles and codes"); *Ross v. Astrue*, 2010 WL 5233722, at *5 (E.D. Ky. 2010).

From my perspective, the real problem with the ALJ's reliance on the VE's testimony is in reaching the conclusion that Pear is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." [R. 25.] The difficulty here is in assessing the total number of jobs available for someone with Pear's condition. The ALJ's decision, relying on the VE's testimony, states that a person with Pear's condition "would be able to perform the requirements of representative occupations such as telephone clerk (3,200 jobs in the region); food/beverage clerk (800 to 1,000 jobs in the region); and office clerk (1,600 jobs)." [*Id.*]

The first issue here is with the number of jobs in each of these categories. The VE did testify that there would be about 1,600 office clerk jobs in the region for someone with Pear's condition. [R. 78.] Under further questioning by Pear's counsel, however, and given the hypothetical that half of Pear's eight five-minute bathroom breaks throughout the workday could be emergencies ("unpredictable" and "running to the bathroom"), that this number would be reduced by 25%. [R. 78-79.]

Moreover, the VE also testified that those circumstances "would eliminate" the 3,200 "telephone clerk position[s] because of the interruption of the phone" and "would also decrease the food and beverage order position by approximately 50 percent." [*Id.*] Given the instability of these numbers, and the fact that the ALJ's decision didn't reconcile or address the issue, there is reason to question whether the ALJ's conclusion on this issue is really supported by the evidence. This is of concern due to how small the numbers are that the VE discussed in her testimony. Indeed, they appear to be close to or even below the threshold number of 1,000 jobs that the Seventh Circuit has repeatedly pointed to as a "significant number" when determining if

16

there are jobs available for which the claimant is qualified.  *See Weatherbee*, 649 F.3d at 572;

*Liskowitz*, 559 F.3d at 743.

Moreover, this numeric instability is exacerbated by the fact that "the region" referred to

by both the ALJ and the VE is unclear.  At the beginning of the VE's testimony, the ALJ asked

the VE "Can you tell me how you define the region?"  [R. 72.]  The transcript of the hearing

shows that the VE stated, "I define the region [INAUDIBLE]."  [*Id.*]  The Commissioner argues

that "[s]ince the ALJ used the word 'region,' it is not reasonable to assume that the VE used

national numbers."  [DE 24 at 11.]  But even if I were comfortable making that assumption, it

still isn't at all clear just how broad or narrow the VE intended the region to be.

Given these evidentiary issues, the case will be remanded to the ALJ in order to clarify

whether there are in fact "jobs that exist in significant numbers in the national economy that

[Pear] can perform." [R. 24.]

## CONCLUSION

For the reasons stated above, this cause is **REMANDED** for further proceedings

consistent with this order.

**SO ORDERED.**

ENTERED: March 1, 2012

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

17